**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Barthinia Bates,

Plaintiff,

v.

Daisy Education Corporation, et al.,

Defendants.

No. CV-24-02647-PHX-KML

**ORDER**

This case concerns Barthinia Bates's brief employment as a teacher at Sonoran Science Academy charter school. Bates alleges defendants discriminated and retaliated against her and subjected her to a hostile work environment in violation of Title VII. The undisputed evidence does not support discrimination or retaliation claims, nor does it establish a hostile work environment. Defendants' motion for summary judgment is granted.

## I. Background

The remaining claims are Title VII claims for discrimination, retaliation, and hostile work environment against Sonoran Science Academy and its operator, Daisy Education Corporation. (Doc. 22 at 4.) Defendants move for summary judgment on all of them. (Doc. 62.) The relevant background is recounted in the light most favorable to Bates, except where video evidence blatantly contradicts her version of events. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**A. Employment Contract**

Bates signed a teacher contract with Sonoran Schools in March 2023. (Doc. 62-2 at 8.) The agreement governed Bates's employment from July 16, 2023, through July 15, 2024 (Doc. 62-2 at 2), and identified an "initial term" as July 16, 2023, through September 14, 2023 (Doc. 62-2 at 3). Bates began teaching summer school and completing training in either May or June 2023, before the contract term began. (*See* Docs. 1 at 14; 63 at 3.)

Bates's contract included a liquidated damages clause. This clause could be enforced against Bates if she departed the role either (1) before or during the "initial term" or (2) following the initial term, at any point before the end of the 2023-24 school year without providing 30 days' notice. (Doc. 62-2 at 3–4.) The clause required a $5,000 payment (or paycheck deduction) to cover costs and expenses related to covering the departing teacher's duties. (Doc. 62-2 at 4.)

**B. Harassment Allegations and Surrounding Events**

Bates alleges Assistant Principal Monroe Walker engaged in several inappropriate acts during her employment. During crisis-prevention training on June 9, 2023, Bates and Walker practiced physical restraint and de-escalation techniques. Bates alleges that Walker pressed his chest against her back and his penis against her buttocks "in a manner wholly inconsistent" with the required training movements. (Docs. 1 at 8; 63 at 7.) However, the video footage shows that Walker's pelvic region came nowhere near Bates's buttocks, and their movements appear entirely consistent with those of other training participants. (Crisis Prevention Training Video at 17:25:25–29, 18:48:35–49:05.)

Bates also alleges that on June 14, Walker complimented her hair while she was in a classroom, and then from the hallway stated it "would be great to grab a hold to when hitting it from the back" while making a pelvic-thrusting motion. (Docs. 1 at 9; 63 at 8–9; 62-18 at 2.) She alleges she covered her eyes and extended her other hand because she wanted the conduct to stop. (Doc. 1 at 9.) Footage from the hallway depicts Walker clapping lightly, pointing toward his head, giving a thumbs up to Bates, then gesturing atop his head with a fist (in what may have been a reference to her hair bun). (Hallway Footage

at 15:42:22–27.) He then held out his left fist, appeared to mouth only a few words, and then doubled over laughing, placing a hand on his chest with an apparent chortle before walking away. (Hallway Footage at 15:42:29–35.) The video shows Walker making zero pelvic thrusts; that region of his body remained almost entirely still. Bates says the video captures her in visible distress (Doc. 63 at 8), but the footage actually shows her nodding at Walker with a smile, placing up a hand, and then shaking her head while seemingly laughing. (Classroom Footage at 15:42:27–37.)

Bates alleges two further incidents occurred on June 15. After Bates mentioned a bug bite, Walker allegedly twice asked whether she had been naked when bitten. (Doc. 1 at 9–10.) Bates says she told Walker to stop and questioned why an assistant principal would speak that way. (Doc. 1 at 10.) Later that day, Walker allegedly told Bates he hoped she would play dodgeball so he could hit her in the face. (Doc. 1 at 10.)

Bates alleges she told Walker on June 17 in person and on the phone that sexual jokes constituted harassment and violated company policy and the law. (Doc. 1 at 10–11.) Call records indicate Bates and Walker engaged in a six-minute phone call on June 17. (Doc. 63-4 at 8.) Text messages between Bates and Walker that same day concern whether Walker would reimburse her $30 for transporting coworkers to obtain vans for a field trip. (Docs. 63-3 at 3; 63-4 at 2–7.) After exchanging some messages about the van pickup, Bates told Walker he had "crossed too many lines…." (Doc. 63-4 at 2–7.) Walker responded by saying "We have teachers all the time help out to get vans. I crossed lines by asking you to help get vans?" (Doc. 63-4 at 5.) The surrounding messages do not mention any sexual misconduct, nor do they appear at all inappropriate. Bates's June 17 message to Principal Courtney Martin likewise complained that Walker had changed his position concerning the promised reimbursement but did not mention harassment or sexual misconduct. (Doc. 63-3 at 3.)

### C. Meeting with Principal Martin and Later Correspondence

In the early afternoon of June 22, 2023, Bates entered Martin's office. (Doc. 62-4 at 2.) On entering, Bates stated "[k]ind of bad news-ish, good for me. I did get a second offer

to the school that I previously interviewed with after you. It is higher, and it is a bonus." (Principal's Office Video ("POV") at 20:05:21–31.[1]) Martin then warned Bates about the liquidated damages clause, to which Bates responded she would "check it out." (POV at 20:05:32–50.) Bates then stated "I am not looking for [a raise] . . . but [the other school] did send me back something higher," and "I am going to entertain it. I don't know if you will match it or give me higher [pay]." (POV at 20:05:53–06:05.) Martin responded the school would not give Bates a higher offer. (POV at 20:06:06.) Bates then stood up, placed her school-issued laptop and charger on Martin's table, and stated "I had a chance to talk with my mom . . . I think I am gonna go with [the other school's offer]." (POV at 20:06:48.) Martin informed Bates the school would reach out regarding the liquidated damages payment (POV at 20:07:17), and Bates disputed whether she would be required to pay it (POV at 20:07:38) but said she would read the contract again (POV at 20:08:12). Martin then closed the conversation, telling Bates to reach out if she needed anything from the school. (POV at 20:08:18.) Before departing, Bates pointed to the laptop and charger on Martin's desk and stated "I didn't get keys, I just have the computer . . . so, yeah, thank you," and then exited the office. (POV at 20:08:23.)

Shortly after this meeting, at 1:42 p.m., Martin emailed Bates, thanking her for stopping by and saying "[w]e accept your resignation and wish you well in your future endeavors." (Doc. 63-3 at 2.) At 1:48 p.m., the Sonoran Schools Human Resources Director, Jayne Wiseman, emailed Bates a copy of the employment agreement and stated:

> I was just informed of your decision to break your contract for the 23-24 school year. However, I will let you know that you are in breach of contract. The contract provides that you must give 30 days' notice which you have not. In light of this, we will be seeking liquid damages up to $5,000 in addition to reporting to [the Arizona Department of Education] that you broke your contract agreement.

(Doc. 62-5 at 2.)

At 1:49 p.m., Bates emailed Martin, stating "[t]his is my 60 days notice for the

---

[1] The timestamps from the video do not appear to match the actual time of events, but they are used for ease of reference to the exhibit.

position offered to me as a teacher" and that August 25, 2023, would be her last day of employment at Sonoran Schools. (Doc. 63-2 at 2.) At 1:50 p.m., Bates responded to Wiseman's email saying she "just sent principal Martian [sic] my 60 day notice." (Doc. 63-2 at 2.) At 1:56 p.m., Wiseman emailed Bates stating "it is known that you approached Ms. Martin and requested more money. Your resignation creates an undue hardship for the school and students. To start the year and then leave 20 days into the school year is not acceptable." (Doc. 63-2 at 2.) At 2:06 p.m., in a chain with Wiseman and Martin, Bates declared Wiseman only "heard one side of the story" and requested a phone call and review of the footage from Martin's office. (Doc. 63-2 at 2–3.) Around the same time, she attempted to call Wiseman but received no answer. (Doc. 63-2 at 3.)

At 2:12 p.m.,[2] Bates emailed Martin, Wiseman, and Assistant Principal Monroe Walker the following: "Let me clarify I was letting me [sic] know I got an offer and shared that it was higher, you can review it. You are jumping the gun and assumed and stated there was going to be a fine. I did not say I quit and I never said I was leaving. Just simply stated I got a 2nd higher offer from an old interview." (Docs. 63-2 at 4; 62-7 at 2.) That same email also raised sexual harassment allegations for the first time, stating "Mrs. Martin I know you are aware of the sexual harassment I recieved [sic] by Mr. Walker. I find it unsettling for me that I brought that up and no one contacted me and you were quick to talk about a fine me. Address sexual harassment, have HR check on me about that." (Doc. 62-7 at 2.) Bates admits she revealed the harassment allegations only after the "threats" of invoking the liquidated damages clause. (Docs. 63 at 5; 1 at 14.)

At 2:24 p.m., Wiseman responded to Bates regarding the sexual harassment allegation. (Doc. 63-2 at 4.) Wiseman stated Bates had not made anyone aware of the sexual harassment until the 2:12 p.m. email, suggested Bates refer to the employee handbook for proper reporting procedures, and encouraged her to provide a statement, details, and any evidence regarding the alleged harassment. (Doc. 63-2 at 4.) However, Wiseman warned

[2] Another email with a timestamp of 2:01 p.m. includes the same recipients and nearly the same text (Doc. 63-3 at 2), but the parties seem to accept the 2:12 p.m. email as the more relevant one. It is unclear whether the 2:01 p.m. version was sent to defendants.

Bates that the school offices were closed until July 10, so any official investigation would not begin until then. (Doc. 63-2 at 4.) Nevertheless, Wiseman said she could immediately review the video footage upon receiving Bates's statement. (Doc. 63-2 at 5.)

At 2:42 p.m., Bates responded to Wiseman asking whether she was being let go, because she "never said I quit." (Doc. 63-2 at 4.) In the same email, Bates said she would give Wiseman her statement on July 10, since the investigation could not be started until then. (Doc. 63-2 at 5.) At 2:50 p.m., Wiseman responded that sexual harassment was a serious allegation and she would need a statement as soon as possible to begin the investigation. (Doc. 63-2 at 5.) At 2:54 p.m., Bates responded, only stating "I asked you a question, do not ignore my question. Are you letting me go?" (Doc. 63-2 at 5.)

The following day, Bates followed up, repeating "I asked you a question, do not ignore my question. Are you letting me go?" (Doc. 63-2 at 5.) Bates also claimed she gave 60 days' notice following her meeting with Martin and added that she would send a 30-day notice and see Wiseman on July 10. (Doc. 63-2 at 5.) That same evening, Bates sent Martin an email purporting to provide a "30 day notice" and identifying her last day as August 4, 2023. (Doc. 63-2 at 6.) In that email, Bates stated her requested departure was due to unprofessionalism from staff members, including Walker. (Doc. 63-2 at 6.) She also demanded a response by the following Monday, three days later. (Doc. 63-2 at 6.) Bates never worked for defendants again. A central dispute between the parties is whether Bates resigned during the meeting with Martin.

As explained above, Bates first expressly reported sexual harassment to Martin and Human Resources in her June 22 email, after the school invoked the liquidated-damages clause. (Docs. 62-7 at 2; 63-2 at 4.) Wiseman immediately requested from Bates a statement, supporting evidence, and witness information. (Doc. 63-2 at 4–5.) On June 24, Bates told Wiseman she had filed a police report concerning Walker's alleged conduct and provided Wiseman with the written statement she had submitted to police. (Docs. 1 at 11; 63-2 at 7–8; 62-18 at 2.) Wiseman reviewed surveillance footage from the training and classroom interaction, interviewed one employee present during the training, and obtained

a statement from Walker. (Docs. 62-9 at 2; 62-17 at 2–3.) Walker denied the allegations (Doc. 62-8 at 2), and the interviewed employee reported observing no inappropriate conduct (Doc. 62-9 at 2). Wiseman concluded the allegations were unsubstantiated (Doc. 62-9 at 2), but Bates disputes the adequacy of the investigation because Wiseman did not interview her or several other individuals Bates believes had relevant information, and because no footage from the parking-lot interaction was produced (Docs. 63 at 7–10; 63-13 at 1–2).

### D. Remaining Discrimination and Retaliation Allegations

Bates alleges defendants discriminated against her based on her race, color, and sex by accepting her resignation, declining to continue paying her, crediting Walker's denial, and conducting what she considers an inadequate investigation. (Doc. 63 at 12–14.) She generally asserts that non-Black or lighter-skinned employees received more favorable treatment and identifies Walker as a more favorably-treated male employee because defendants obtained his statement and continued employing him. (Doc. 63 at 12–14.)

Bates characterizes her alleged pre-June 22 confrontations with Walker and her June 22 email as protected activity. (Doc. 63 at 15.) She characterizes defendants' reliance on the liquidated-damages clause, their report to Arizona state education authorities, their treatment of her departure as a resignation, the investigation itself, and Wiseman's June 27 proposal to waive liquidated damages in exchange for a release as retaliation. (Doc. 63 at 14–15; *see also* Doc. 63-12 at 3.) Bates seeks reimbursement of unspecified medical bills, compensation for a portion of the period following her departure, and damages for emotional distress and pain and suffering. (Docs. 1 at 5; 63-2 at 11; 63-13 at 2.)

## II. Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of presenting the basis for the motion and identifying evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But a non-movant cannot rest on mere allegations or denials and must instead show there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 289 (1968)). When the record blatantly contradicts the non-movant's version of events, the court need not adopt that version for purposes of summary judgment. *Scott*, 550 U.S. at 380.

## III. Analysis

The precise contours of Bates's claims are difficult to discern. Her briefing repeatedly assigns different Title VII labels to the same events without clearly explaining which facts support each claim or how those facts satisfy the distinct governing standards. Construing her arguments generously, the court addresses discrimination, retaliation, and hostile work environment separately.

### A. Discrimination

Bates's discrimination claims rest on her contentions that defendants treated her less favorably because of race, color, and sex when they treated her employment as ended, invoked the resulting contractual consequences, and credited Walker's denial after an inadequate investigation. (Doc. 63 at 12–14.) She asserts that unidentified lighter-skinned and non-Black employees received more responsive treatment and that Walker received preferential treatment as a male employee. (Doc. 63 at 12–14.)

Title VII prohibits an employer from discriminating against an employee because of race, color, or sex. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a prima facie case of discrimination by showing (1) she belongs to a protected class; (2) she was qualified

for her position; (3) she experienced an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Lui v. DeJoy*, 129 F.4th 770, 777–78 (9th Cir. 2025); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Favorable treatment of similarly-situated employees outside the protected class is one means of satisfying the fourth element. *Lui*, 129 F.4th at 778–79. If the plaintiff establishes a prima facie case, the employer must offer a legitimate, nondiscriminatory reason for its action, and then the plaintiff must identify evidence that reason was pretextual. *Hittle v. City of Stockton*, 101 F.4th 1000, 1012 (9th Cir. 2024). Pretext may be shown directly by evidence that discrimination more likely motivated the employer, or indirectly by evidence that the employer's explanation is unworthy of credence. *Id.* (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

Bates has not established a prima facie case. To the extent she relies on constructive discharge as an adverse employment action, that theory fails because constructive discharge requires working conditions "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (simplified). Bates's evidence regarding Walker's behavior—the only events that happened before she resigned—does not reach that level. *See Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1161 (D. Ariz. 2016), *aff'd*, 705 F. App'x 539 (9th Cir. 2017) (no constructive discharge where supervisor made offensive comments and belittled employee but employee resigned before employer could investigate complaint). Bates also identifies no similarly-situated employee who was treated more favorably; her generalized references to lighter-skinned and non-Black employees identify no particular employee or evidence showing anyone was similarly situated to her "in all material respects." *See Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (simplified); *see also Tusima v. Banner Univ. Med. Ctr. Phx.*, No. CV-21-01693-PHX-JJT, 2023 WL 3344633, at *7 (D. Ariz. May 10, 2023). Walker—the only individual Bates names as a potential comparator (*see* Docs. 63 at 12–14; 65 at 12)—is not similarly situated because he was the supervisor accused of misconduct, not an employee on Bates's level treated more favorably. *See White*

*v. AKDHC, LLC*, 664 F. Supp. 2d 1054, 1068 (D. Ariz. 2009) ("[S]upervisors are not similarly situated to lower level employees."). And although a plaintiff may proceed without using the *McDonnell Douglas* framework by producing direct or circumstantial evidence that a discriminatory reason more likely than not motivated the employer (and thus need not identify a comparator), *see McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122–23 (9th Cir. 2004), Bates identifies no such evidence here.

Even assuming Bates had established a prima facie case, her discrimination claims would fail at the pretext stage. Defendants have offered legitimate, nondiscriminatory reasons for the challenged actions. Based on Bates's undisputed actions in the June 22 meeting, they treated Bates's employment as ended, invoked the liquidated-damages clause, and planned to report the alleged contract breach to state education authorities because they reasonably understood her to have resigned. And they did not discipline Walker because Wiseman's investigation concluded Bates's allegations were unsubstantiated.

Bates has not produced evidence from which a reasonable jury could find those explanations pretextual. The recording of the June 22 meeting supports defendants' understanding that she resigned. Bates discussed the higher offer, stated she thought she was "gonna go with it," and left her laptop and charger with Martin while explaining she had no keys to return. Martin accepted the resignation shortly afterward, and Wiseman then invoked the contractual consequences. Bates's later disagreement with defendants' interpretation of the meeting does not show that their explanation was fabricated or that race, color, or sex motivated their actions. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (explaining the key question is whether the employer honestly believed its reasons for its actions, not whether the reasons were objectively correct).

The asserted deficiencies in Wiseman's investigation likewise do not establish pretext. Wiseman requested Bates's statement and supporting information, reviewed surveillance footage, obtained Walker's statement, and interviewed an employee who attended the crisis-prevention training before concluding the allegations were

unsubstantiated. Bates argues Wiseman should have interviewed additional witnesses, involved Bates more directly, preserved additional footage, and produced a more complete investigative file. But even assuming the investigation could have been more thorough, Bates identifies no evidence Wiseman omitted those steps because of Bates's race, color, or sex. Nor does she—after having the opportunity to engage in discovery herself as part of this lawsuit—identify any evidence defendants treated a similarly-situated complainant more favorably, or that they did not honestly rely on the investigation's conclusion. *See Kama v. Mayorkas*, 107 F.4th 1054, 1059 (9th Cir. 2024) (reaffirming the pretext holding in *Villiarimo*); *see also Munoz v. Mabus*, 630 F.3d 856, 865 (9th Cir. 2010) ("Merely denying the credibility of the employer's proffered reasons is insufficient to withstand summary judgment.").

No reasonable jury could find defendants' stated reasons for treating Bates's employment as ended or declining to discipline Walker were pretext for unlawful discrimination. Defendants are therefore entitled to summary judgment on the discrimination claims.

**B. Retaliation**

Bates contends defendants retaliated against her after she complained about Walker. The retaliatory actions she identified consisted of treating her employment as ended, invoking contractual remedies, reporting the alleged breach to state education authorities, and inadequately investigating her complaint. (Doc. 63 at 14–15.) To establish retaliation, Bates must show she engaged in protected activity, suffered an adverse employment action, and that there was a causal connection between the two. *Maner v. Dignity Health*, 9 F.4th 1114, 1127 (9th Cir. 2021). Title VII retaliation claims are also governed by the *McDonnell Douglas* burden-shifting framework, which requires the plaintiff to establish a prima facie case, the employer to then offer a legitimate, nonretaliatory reason for its actions, and the plaintiff to then produce evidence that the stated reason was a pretext for retaliation. *Lui*, 129 F.4th at 782 (citing *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008)).

Bates has not established a prima facie case of retaliation because the undisputed chronology defeats any inference of causation. Bates contends she engaged in protected activity before June 22 by telling Walker his sexual comments constituted harassment and violated the law. Whether an employee's objection made only to the alleged harasser qualifies as protected opposition is not entirely settled. *Compare EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067–68 (6th Cir. 2015) (holding an employee engages in protected activity by demanding a harassing supervisor cease his conduct) *with LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 389 (5th Cir. 2007) (holding a single rejection of supervisor's sexual advance was not protected activity); *see also Tate v. Exec. Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008) (recognizing the disagreement and declining to resolve it); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 116 n.12 (2d Cir. 2013) (same).

The court need not decide the issue because, even assuming Bates's alleged objections to Walker were protected, she identifies no evidence that Walker communicated them to Martin or Wiseman or influenced their initial decisions. A retaliation plaintiff must produce evidence from which a reasonable jury could find the officials responsible for the challenged action knew of the protected activity; what another supervisor knows is not automatically imputed to the decisionmakers. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197–98 (9th Cir. 2003). The undisputed facts show Martin accepted Bates's resignation and Wiseman invoked the contractual consequences and announced the contemplated agency report before either knew of Bates's harassment complaint. That chronology defeats any inference of causation, and therefore could not support a retaliation claim. *See Maner*, 9 F.4th at 1127–28.

Even assuming Bates could establish a prima facie case, she identifies no evidence of pretext. Defendants' legitimate reasons for the challenged actions are the same ones discussed above, and the resignation recording, contemporaneous correspondence, and investigation materials support those explanations. The chronology provides additional support: Martin accepted Bates's resignation and Wiseman announced that defendants

would invoke the contractual consequences and report the alleged breach to state education authorities before Bates's first documented harassment complaint. Bates identifies no retaliatory remarks, shifting explanations, or other evidence suggesting defendants did not honestly hold their stated reasons. *See Kama*, 107 F.4th at 1059. Even considering the alleged June 27 proposal, an offer to resolve the existing contract dispute by waiving the asserted liquidated damages in exchange for a release does not suggest defendants' stated reasons were pretextual. *See Mundy v. Household Fin. Corp.*, 885 F.2d 542, 547 (9th Cir. 1989) ("The mere offer of money in exchange for a release of all claims does not by itself raise an inference that [the employer's] articulated reasons . . . are pretextual."). Accordingly, defendants are entitled to summary judgment on the retaliation claim.

**C. Hostile Work Environment**

Bates contends Walker's alleged sexual conduct created a sex-based hostile work environment. (Doc. 63 at 14–15.) To establish a hostile work environment based on sex, Bates must show she was subjected to unwelcome verbal or physical conduct of a sexual nature that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 647 (9th Cir. 2021). The environment must be both subjectively and objectively hostile. *Id.* at 648. In evaluating objective hostility, courts consider the conduct's frequency and severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work. *Id.* A single incident can support a claim only if it is "extremely severe." *Id.* (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000)).

Bates cannot satisfy this standard. The video evidence forecloses the most serious aspects of her account: the crisis-prevention footage does not show Walker pressing his genital area against her, and the hallway footage does not show him making a pelvic-thrusting motion. What remains, crediting Bates's account of the alleged remarks, is a handful of brief comments over roughly one week. Although inappropriate if made, those isolated remarks were not sufficiently severe or pervasive to alter the conditions of her

employment. *See id.* at 649–51 (one suggestion that plaintiff seek work outside a female-oriented field and two suggestions that he wear a wig were too infrequent and insufficiently severe to create a hostile work environment); *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1019–21 (9th Cir. 2018) (few isolated and relatively mild sex-related comments were insufficient); *cf. EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 999–1001 (9th Cir. 2010) (triable hostile-work-environment claim existed based on more than six months of constant and often daily sexual pressure, humiliation, and coworker ridicule despite plaintiff's repeated rejections). Bates's criticism of the later investigation does not alter that conclusion. (Doc. 63 at 14–15.) Nothing about the investigation exposed her to additional harassment or otherwise made the conditions under which she worked abusive.

In addition, because Bates has not established even the lower severe-or-pervasive standard necessary for a hostile work environment, she cannot satisfy the higher standard for constructive discharge to the extent she invokes that theory for this claim too. *See Brooks*, 229 F.3d at 930 ("Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge."). Defendants are therefore entitled to summary judgment on Bates's hostile-work-environment claim.

**D. Rule 56(d)**

Rule 56(d) permits the court to defer or deny summary judgment when the non-movant shows by affidavit or declaration that, for specified reasons, she cannot present facts essential to justify her opposition. The requesting party must identify the specific facts she expects further discovery to reveal, show those facts exist, and explain why they are essential to opposing summary judgment. *Stevens v. CoreLogic, Inc.*, 899 F.3d 666, 677–78 (9th Cir. 2018). Relief may also be denied when the party did not diligently pursue discovery. *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1005 (9th Cir. 2002).

Bates seeks additional investigation records, witness statements, internal communications, and surveillance footage. (Doc. 63-14 at 1–2.) Her declaration identifies those categories and asserts they would show no legitimate investigation occurred, that she

was pressured to resign, and that defendants acted with discriminatory or retaliatory motive. But it does not identify specific facts she expects the materials to reveal or provide a nonspeculative basis to believe such facts exist. Nor does the record establish diligence. Although Bates states she requested the materials informally and through formal discovery, she does not show she timely invoked the court's discovery-dispute procedure before discovery closed. (*See* Doc. 47 at 1–2 (outlining that procedure and warning Bates she must comply with the same rules of procedure that govern other litigants).) Finally, she does not explain how the requested materials would reveal facts capable of altering the analysis above. Bates's Rule 56(d) request is denied.

Accordingly,

**IT IS ORDERED** defendants' motion for summary judgment (Doc. 62) is **GRANTED**. The Clerk of Court shall enter judgment in favor of defendants and close this case.

Dated this 14th day of August, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**